Filed 7/25/24; Certified for Publication 8/19/24 (order attached)
See concurring opinion

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RIVERSIDERS AGAINST INCREASED TAXES,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF RIVERSIDE et al.,<br><br>    Defendants and Appellants;<br><br>REBECCA SPENCER<br><br>    Defendant and Respondent. | E078961<br><br>(Super.Ct.No. CVRI2104120)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Harold W. Hopp, Judge.

Affirmed in part and reversed in part.

Phaedra A. Norton, City Attorney, and Susan Wilson, Assistant City Attorney;

Greines, Martin, Stein & Richland, Timothy T. Coates, Alana H. Rotter, and Jeffrey

Gurrola, for Defendants and Appellants City of Riverside et al.

1

Law Office of Chad Morgan, and Chad D. Morgan, for Plaintiff and Appellant Riversiders Against Increased Taxes.

No appearance for Defendant and Respondent Rebecca Spencer.

Jonathan M. Coupal, Timothy A. Bittle, and Laura E. Dougherty, for Howard Jarvis Taxpayers Foundation as Amicus Curiae on behalf of Plaintiff and Appellant Riversiders Against Increased Taxes.

Riversiders Against Increased Taxes (RAIT), filed a petition for writ of mandate seeking to rescind the resolution placing Measure C on the November 2, 2021, election ballot, seeking a declaratory judgment that Measure C violated Proposition 218 was a general tax that cannot be voted on in a special election, and injunctive relief to restrain the City of Riverside (City) from wasteful spending on the election to consider the measure. The City opposed the petition arguing the election was a general election as required by Proposition 218, because it was a regularly scheduled election, despite the fact it was referred to as a "special municipal election" in the City council's agendas and minutes. The matter was heard after the election, where the measure passed easily. The trial court granted the writ of mandate as to the declaratory relief claim only, finding that the election was a special election, but that it was not able to cancel the election that had already taken place or to enjoin certification of the election results. Both the City and RAIT appealed.

On appeal, the City argues that the trial court's declaratory judgment erroneously held that the election was a special, rather than a general election, and that, if we agree, the lower court's finding that RAIT was the prevailing party must be reversed. On cross-

2

appeal, RAIT argues that the trial court erred in not ordering the removal of Measure C from the ballot in September 2021, and in declining to enjoin the certification of the election results. We reverse the order granting the petition as to the declaratory relief cause of action and affirm as to the denial of the balance of the petition.

## BACKGROUND

For many years, the City transferred excess fees collected from the City-operated electric utility to the City's general fund, which provides essential funding for community services such as police, fire, children's after-school programs, senior/disabled services. In 2018, the City was sued in a case captioned *Parada v. City of Riverside* (Super. Ct. Riverside County, 2018, No. RIC 1818642) (*Parada*), in which the plaintiffs argued that the setting of electric rates at an amount greater than the reasonable cost of providing electric utility service, which excess was transferred to the City's general fund, constituted a tax, which had not been placed before voters for approval. The City entered into a stipulated settlement agreement by which the City agreed to place its general fund transfer practices before voters in a ballot measure for the November 2021 election.

On July 20, 2021, pursuant to the *Parada*, *supra*, RIC 1818642 settlement agreement, the City proposed an amendment to the Riverside city charter, adding section 1204.2,[1] to authorize the transfer of an amount not to exceed 11.5 percent of the gross operating revenues, exclusive of surcharges, of the electric utility, to be used to maintain local general purposes such as 911 response, fire, paramedic, police, street repairs, parks,

---

[1] All undesignated section references are to the Riverside city charter unless otherwise indicated.

3

senior services, homelessness and other general services. Measure C, proposing adoption of the amendment by voters, was to be placed on the ballot for the November 2, 2021, election. The city council considered the proposal and approved a resolution to submit the adoption of the amendment to voters by way of a ballot measure.

According to the charter of the City, general municipal elections for local offices held in common with statewide elections are general elections, whereas all other local elections are "special elections." (§§ 500 [elections], 501 [special municipal elections].) General municipal elections for city council and "such other purposes as the City Council may prescribe" shall be held on the same day as the statewide election, consistent with the state primary election date. (§ 500.) All other elections are to be held in accordance with the state's Election Code. (§ 502.)

The city council approved Resolution No. 23740, "Ordering, calling, providing for, and giving notice of a special municipal election to be held in said city on the 2nd day of November 2021, for the purpose of submitting to the qualified electors an amendment to the Charter of the City of Riverside." (Some capitalization omitted.) In addition, five council members were selected and authorized to prepare ballot arguments relating to Measure C, the proposed City charter amendment.

The November election was the regularly scheduled date for the city council runoff election, had one been necessary, as provided by the City charter.[2] Until 2021,

_____

[2]     The relevant charter provisions state: "Sec. 500. General municipal elections.
    "On June 8, 2021, an election for Councilmembers to represent Wards 2, 4 and 6 shall be held. Said term shall be for five (5) years and until their respective successors

City council runoffs would normally occur in November of odd-numbered years, pursuant to section 400(c), (d), and section 401. No November runoff election was necessary in 2021, however, because a candidate in each of Wards 2, 4, and 6 obtained more than 50 percent of the vote in the June 2021 election.

On August 3, 2021, at the city council meeting, council members adopted a resolution to "1. Adopt Resolution Ordering, Calling, Providing For, and Giving Notice of a Special Municipal Election to be Held in Said City on the 2nd Day of November, For the Purpose of Submitting to the Qualified Electors an Amendment to the Charter of the City of Riverside, Repealing Resolution No. 23740 and [¶] 2. Consider whether to defer submitting a ballot argument in favor of the proposed ballot measure if ballot arguments are submitted by other individual voters, or a bona fide association of citizens, or combination of voters and associations, or individual voters who are eligible to vote on the measure."

---

qualify. Beginning in 2026 and thereafter, the Councilmembers' terms shall be for four (4) years.

"Beginning in 2022, general municipal elections for the election of the members of the City Council and for such other purposes as the City Council may prescribe shall be held in the City on same day as the statewide election, consistent with the primary election date set by the State.

"General municipal elections for the election of the Mayor shall be held on the same day as the statewide election, consistent with the primary election date set by the State in United States Presidential election years. (Effective 1/5/2007; Char. Am. of 11-3-2020(3)).

"Sec. 501. Special municipal elections.

"All other municipal elections that may be held by authority of this Charter, or of any law, shall be known as special municipal elections. (Effective 12/27/1995.)"

On August 3, 2021, the city council considered and adopted an amended resolution which referred to the June 8, 2021, general election, held earlier that year, and discussed how section 400(d) of the city charter required the city to call a special election to be held on November 2, 2021, if no candidate won a majority, but that no runoff election was scheduled because all successful candidates in the June election won by more than 50 percent. The amendment to the resolution further stated that based on the published decision in *Silicon Valley Taxpayers' Assn. v. Garner* (2013) 216 Cal.App.4th 402, 407-408 (*Silicon Valley*), a special election for a tax measure can be called even though no candidate is on the ballot. The city council therefore desired to set a Uniform District Election Law to be held concurrently with the special municipal election on November 2, 2021. This resolution was adopted at the city council meeting on August 3, 2021. Ballot materials mailed to voters referred to the election as a "Consolidated General Election."

On September 9, 2021, RAIT filed a petition for writ of mandate seeking a declaration that Measure C, if adopted would violate Proposition 218, and an order enjoining the City from wasteful spending on an election to consider the measure. RAIT's argument was that because the resolution adopted by the city council referred to the November 2, 2021, election as a "special election," submission of the tax measure violated California Constitution, article XIII C, enacted pursuant to Proposition 218. RAIT also sought an ex parte order setting a hearing on the petition itself and seeking a temporary restraining order preventing further action on Measure C. RAIT argued that the status conference hearing for petition had been scheduled for November 8, 2021, but

6

that ballots would be mailed on or shortly after September 23, 2021, and the election would be conducted on November 2, 2021, and the matter needed to be resolved before the election.

The City opposed the ex parte application for order shortening time. At the ex parte hearing, the court ordered the hearing on the application for a temporary restraining order to take place on September 24, 2021.

However, on September 24, 2021, the court continued the hearing on the temporary restraining order as well as for ruling on the balance of the petition to take place on October 6, 2021. In setting the date, the court recognized the need to have the matter resolved before the election. On October 6, 2021, the matter was continued until October 22, 2021, on which date the parties discussed further briefing and scheduling.

After extensive briefing, on November 9, 2021, after the election, the trial court initially indicated it would deny the preliminary injunction to the extent it sought to delay certification and ordered the parties to appear and argue whether the court should enjoin transfers to the general fund pending the decision, but, after the parties orally argued, the court granted the preliminary injunction, pending resolution of the case, or until further order. On that same date, the court took under submission the remaining issues of the petition for writ of mandate.

On November 15, 2021, the court issued an order granting the motion for a preliminary injunction enjoining the City from certifying the results of the election on Measure C until further order. The court received further briefing and many additional documentary exhibits.

On January 7, 2022, the court conducted the hearing on the petition for writ of mandate, and requested further briefing on the issue of the appropriate remedy if the court were to deem the election to be a special rather than a general election. In compliance with the order, RAIT submitted a supplemental brief agreeing that the court may not enjoin the certification of election results.

On January 19, 2022, RAIT filed a first amended petition for peremptory writ of mandate, consistent in many ways with the original petition, in seeking a writ of mandate to prevent the election, as well as declaratory relief relating to the determination of whether the measure violates the California Constitution and requesting injunctive relief to prevent the government from wasteful expenditures. One notable change was the allegation in the petition that even if the ballots were mailed and then counted on or after November 2, 2021, the special election can be canceled at any time up to the point that the result is certified. The amendment also corrected a typographical error in the jurisdictional allegations which had incorrectly referred to Ventura County rather than Riverside County in the original petition; it further added an allegation that the court still had time to act on the petition any time prior to the announcement of the certified election results.

On January 24, 2022, the court held the hearing on the petition. The minutes reflect that the court and all counsel conferred on various issues, including objections to the first amended petition, the declaratory relief ruling, as well as pre- and post- election challenges, and then took the case under submission. No court reporter's transcript is available for this hearing.

On April 25, 2022, the court issued its ruling on the submitted matter. The court determined that the election was a special election granting judgment in favor of RAIT on the second claim for declaratory relief but concluded that the petition for writ of mandate and the injunctive relief claims were moot because the election could not be canceled and a court was not authorized to enjoin the certification of election results, because that is a ministerial duty. The court concluded that because the election was a special election, it did not comply with Proposition 218, by way of declaratory judgment.

On April 29, 2022, RAIT sought an ex parte order to stay the decision rendered three days earlier in order to keep the preliminary injunction in place pending appeal. The court denied the application except to stay the previous order that enjoined certification of the election for 48 hours after the court signs it to give petitioners a chance to seek a writ of supersedeas asking the Court of Appeal to stay that portion of the order pending appeal.

On May 10, RAIT filed its notice of appeal.[3] On May 19, 2022, the City filed its notice of appeal, following the entry of the formal judgment.[4]

## DISCUSSION

The parties agreed to a briefing sequence pursuant to which the City filed the appellant's opening brief and RAIT would file a respondent's and cross-appellant's opening brief. We review the parties' contentions accordingly.

---

[3] The notice of appeal is not file stamped so the date assigned is taken from the docket of this court.

[4] See footnote 3.

9

1.  *The City's Appeal*

The City argues that Measure C did not violate Proposition 218 because the November election was a regularly scheduled election, and the City consolidated the Measure C election with that regularly scheduled city council runoff. The City further contends that the city council runoff election met the state-law definition of a general election because it was mandatory, and the date was prescribed by law.

RAIT contends that as a general tax, Measure C was subject to voter approval at an election "'consolidated with a regularly scheduled general election for members of the governing body of the local government.'" RAIT further argues that the November 2, 2021, election was a special election, because the state-law definition of a general election does not apply to charter cities, such as Riverside.

A.  *Standard of Review*

The question of whether Measure C was properly presented to electors at the November 2, 2021, election depends on whether that election was a general or a special election. This question requires an interpretation of the Riverside City Charter and various laws governing elections by local authorities.

"'It is well established the applicability of a statute to undisputed facts is a question of law and a reviewing court is not bound by the trial court's conclusion.'" (*County of San Bernardino v. West Valley Water Dist.* (2022) 74 Cal.App.5th 642, 651, quoting *County of Fresno v. Clovis Unified School Dist.* (1988) 204 Cal.App.3d 417, 426.)

10

B. *General Legal Principles Governing Municipal Elections Affecting Tax*

    *Measures.*

As acknowledged by the Amended City Council Memorandum of July 20, 2021, "Proposition 218 was adopted by California voters in 1996 and Proposition 26 was adopted in 2010. Both of those propositions amended the California Constitution to provide that certain fees and charges imposed by public agencies must be approved by voters. In general, if a fee or charge for a service exceeds the cost to provide that service, voters must approve the fee or charge. For utilities, Proposition 218 applies to water service and Proposition 26 applies to electric service."

Proposition 26 requires the local government to prove "'by a preponderance of the evidence that … [an] exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity.' (Cal. Const., art. XIII C, § 1, subd. (e)." (*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 11 (*Citizen for Fair REU Rates*); see *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 261.)

The transfer of excess revenue received by the municipal utility has been collected and transferred to the general fund since 1907. The City makes no argument that the amounts received by the municipal utility, which exceeded the reasonable costs of the governmental activity, is not a tax, although not all such transfers of excess revenue qualify as "taxes." (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 11; but see *Webb*

11

*v. City of Riverside* (2018) 23 Cal.App.5th 244, 260 [transfer of excess revenue received by municipal utility did not constitute a tax because it did not increase the amount levied on Riverside ratepayers].) Because the City did not maintain that the transferred revenue was not a tax, the sole question for us to answer is whether the November 2, 2021, election was a general or a special election. We turn to the rules of statutory constitution to answer this question.

When interpreting a law added by voter initiative (such as Proposition 218), we look to its language as the best indication of the voters' intent. (*City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1172 (*Claremont*); *Woo v. Superior Court* (2000) 83 Cal.App.4th 967, 975 (*Woo*).) When that language is unambiguous, we presume the voters intended the meaning apparent on the face of the provision. (*Woo*, *supra*, at p. 975.) Extrinsic materials, such as analyses and arguments contained in the official ballot pamphlet, may be used to interpret ambiguous language or to confirm the plain meaning of the provision. (*Silicon Valley*, *supra*, 216 Cal.App.4th at p. 407; *Jenkins v. County of Los Angeles* (1999) 74 Cal.App.4th 524, 530–531.) They may not be used to add to or rewrite the provision """to conform to an assumed intent that is not apparent in its language.""" (*Claremont*, *supra*, at p. 1172; see *Protect Our Benefits v. City and County of San Francisco* (2015) 235 Cal.App.4th 619, 633.)

The ""plain meaning" rule … does not require courts to automatically adopt the literal meaning of a statutory provision." (*Rando v. Harris* (2014) 228 Cal.App.4th 868, 880-881, citing *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) Thus, where a literal construction would frustrate the purpose of the statute, that construction is not adopted.

(*Arias v. Superior Court* (2009) 46 Cal.4th 969, 979 [nonliteral construction of Prop. 64 adopted based on evidence of underlying purpose and voter intent]; *Bob Jones University v. United States* (1983) 461 U.S. 574, 586 [a well-established canon of statutory construction provides that literal language should not defeat the plain purpose of the statute].)

Further, courts will not adopt a literal construction when it produces absurd consequences. (*Woo*, *supra*, 83 Cal.App.4th at p. 975.) Instead, voter intent is the paramount consideration in interpreting a charter provision. (*Ibid*. at p. 975; *Arntz v. Superior Court* (2010) 187 Cal.App.4th 1082, 1092.)

Proposition 218 provides in part, "The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government …." (Cal. Const., art. XIII C, § 2(b).) "Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition, which election shall be held within two years of the effective date of this article and in compliance with subdivision (b)." (Cal. Const., art. XIII C, § 2(c).) To the extent the transfers of excess utility fees collected to the general fund were taxes, they were subject to approval by a simple majority of voters voting in an election held within two years of the adoption of Proposition 218. (*Ibid.*)

The charter for the City provides for "general municipal elections for the election of the members of the City Council and for such other purposes as the City Council may

13

prescribe shall be held in the City on same day as the statewide election, consistent with the primary election date set by the State. [¶] General municipal elections for the election of the Mayor shall be held on the same day as the statewide election, consistent with the primary election date set by the State in United States Presidential election years." (§ 500.) This charter language satisfies requirements of the Elections Code governing municipal elections.[5]

In addition, the City charter provides, "Unless otherwise provided by ordinance hereafter enacted, all elections shall be held in accordance with the provisions of the Elections Code of the State of California, as the same now exist or hereafter may be amended, for the holding of elections in cities so far as the same are not in conflict with the Charter." (§ 502.)

---

[5]     Elections Code section 1301, provides in relevant part: "(1) Notwithstanding subdivision (a), a city council may enact an ordinance, pursuant to Division 10 (commencing with Section 10000), requiring its general municipal election to be held on the day of the statewide direct primary election, the day of the statewide general election, the day of school district elections as set forth in Section 1302, the first Tuesday after the first Monday of March in each odd-numbered year, or the second Tuesday of April in each year. An ordinance adopted pursuant to this subdivision shall become operative upon approval by the county board of supervisors.

"(2) In the event of consolidation, the general municipal election shall be conducted in accordance with all applicable procedural requirements of this code pertaining to that primary, general, or school district election, and shall thereafter occur in consolidation with that election.

"(c) If a city adopts an ordinance described in subdivision (b), the municipal election following the adoption of the ordinance and each municipal election thereafter shall be conducted on the date specified by the city council, in accordance with subdivision (b), unless the ordinance in question is later repealed by the city council." (Elec. Code, § 1301, subd. (b)(1)-(2), (c).)

14

The instant dispute arises due to the language of section 501 of the charter, which provides, "All other municipal elections that may be held by authority of this Charter, or of any law, shall be known as special municipal elections." Due to this language, the regularly scheduled runoff election for local office was labeled a special election, despite being consolidated with a regularly scheduled election and despite the charter provision providing that such elections be regularly scheduled to coincide with a general local, state, or federal election. We note a conflict between section 502 of the charter and the definition of a "special election" under Elections Code section 356.

A "'General election' means either of the following: [¶] (1) The election held throughout the state on the first Tuesday after the first Monday of November in each even–numbered year. [¶] (2) Any statewide election held on a regular election date as specified in Section 1000." (Elec. Code, § 324, subd. (a).) "'A regular or general election is one which recurs at stated intervals as fixed by law; it is one which occurs at stated intervals without any superinducing cause other than the efflux of time. … In application of the foregoing rules, it is held that the term "general election" embraces a primary election occurring at regular intervals ….'" (*County of Alameda v. Sweeney* (1957) 151 Cal.App.2d 505, 511-512; see *Cummings v. Stanley* (2009) 177 Cal.App.4th 493, 508-509.)

A "'Special election' is an election, the specific time for the holding of which is not prescribed by law. (Elec. Code, § 356.) This definition conflicts with the charter's language in section 501, labeling as "special municipal elections" those elections that are otherwise deemed general elections under state law, because they are held at regularly

15

scheduled intervals. A "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) However, "'"'if otherwise valid local legislation conflicts with state law, it is preempted by such law and is void."'"" (*Chevron U.S.A. Inc. v. County of Monterey* (2023) 15 Cal.5th 135, 142.)

Because the charter's definition of "special municipal election" is in conflict with the state definition, the definition of "special election" found in the Elections Code trumps it. The November 2021 election was a regularly scheduled election under both the City's charter and the Elections Code. Additionally, the City's resolution consolidated the ballot measure with the regularly scheduled general election for local office. It was therefore a general election. Despite the unfortunate reference to "special municipal election" in section 501 of the City's charter and the resolutions adopted by the City to facilitate submission of the measure to voters, the regularly scheduled runoff election satisfies the criteria for a general election because it is regularly scheduled to coincide with the statewide general election. The provisions governing the City's municipal elections for charter amendments satisfies the intent and meaning of Proposition 218's requirement that the measure be put submitted for elector approval at a general election.

"Proposition 218 was passed in 1996 by the electorate to plug certain perceived loopholes in Proposition 13. [Citations.] Specifically, by increasing assessments, fees, and charges, local governments tried to raise revenues without triggering the voter approval requirements in Proposition 13." (*Silicon Valley*, *supra*, 216 Cal.App.4th at

16

pp. 405–406.) In this case, the City recognized that, as a general tax, the charter amendment relating to the transfer of revenue from the municipal utility to the general fund required placing the matter before the voters at a "regularly scheduled election." This, the City did, complying with Proposition 218.

RAIT's argument that the City violated Proposition 218 by placing the proposed charter amendment on the November 2021 ballot because that election was a "special election," must fail because the issue of what constitutes a general election is defined by statute in the context of Proposition 218. Section 2(b) of Proposition 218 refers to "The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government," and does not refer to elections defined according to local charters. (See *People v. Town of Berkeley* (1894) 102 Cal. 298, 306 ["Two classes of elections only are spoken of, general and special; and a regular annual municipal election cannot be included in the latter class, but must be treated as a general election"].)

To conclude otherwise would render Proposition 218 inherently ambiguous and incapable of uniform statewide application, where each local government could apply or redefine the terms "general" and "special" elections, as those terms appear in the constitutional provision, in endlessly conflicting and inconsistent ways, according to individual local charters. Under the statute, the November 2021 election, at which Measure C was submitted to voters, was a general election.

A similar question was presented in *Silicon Valley*, *supra*, 216 Cal.App.4th 402, where a general tax was placed on a local ballot for consideration by taxpayers at a

17

regularly set runoff election for local offices. In that case, because no candidates were required to stand for election in a runoff, the petitioners alleged that placement of Measure A (involving a 10-year one-eighth of a cent sales tax increase) on the November 2012 ballot violated article XIII C, section 2, subdivision (b), of the California Constitution (Proposition 218), which requires that local tax increase measures be placed on the ballot with a regularly scheduled general election for members of the local government's governing body. Because no members of the local government's governing body were actually on the ballot, petitioners contended the election was a special election, at which a general tax increase may not be submitted for a vote.

There, the court construed Proposition 218 in harmony with the election scheme, reasoning that the language requiring "[a] regularly scheduled general election for members of County's Board of Supervisors," meant an election that is fixed to occur during the statewide primary and general elections, and not a run-off election that is "'actually scheduled.'" (*Silicon Valley*, *supra*, 216 Cal.App.4th at p. 408, citing *People ex. Rel. Bohen v. Hossefross* (1860) 17 Cal. 137, 141 [the words ""'for the election of State and county officers'" do not describe a particular election but 'indicate the period of election as that at which State and county officers might be elected"']; see *Jeffrey v. Superior Court* (2002) 102 Cal.App.4th 1, 8 ["The most natural construction of the words 'regularly scheduled election' would be *any* regularly scheduled election"].)

The court reasoned that Proposition 218 specifically states that "'[t]he provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.'" (*Silicon Valley*, *supra*, 216

18

Cal. App.4th at p. 408.)  It therefore held that to interpret "'regularly scheduled general election' to mean 'actually scheduled general election' would limit the opportunities for taxpayers to vote on taxes and thereby contravene one of the stated objectives of Proposition 218." (*Id.* at p. 409.)

The situation before us quite similar, so we adopt the holding and reasoning of *Silicon Valley*.  Because the county charter involved in this case provides for regularly scheduled elections for local office to coincide with general state and federal elections, the election was regularly scheduled, despite the fact no candidates for local office were on the ballot.  (*Silicon Valley*, *supra*, 216 Cal.App.4th at pp. 409-410.)  Moreover, because the November 2021 election does not meet the definition of "special election" under Elections Code section 356, it was a general election.

We therefore reverse the trial court's judgment on the declaratory relief cause of action of the petition.

## II.  *RAIT's Appeal*

RAIT argues the trial court erred by not removing Measure C from the ballot in September 2021. The City argues that RAIT's appeal is moot.  It is moot, and it was also not preserved for appellate review.

We recognize we have discretion "to consider the merits if the appeal presents a question "'capable of repetition, yet evading review'"" (*Horneff v. City & County of San Francisco* (2003) 110 Cal.App.4th 814, 818-819, quoting *Ferrara v. Belanger* (1976) 18 Cal.3d 253, 259; *Hammond v. Agran* (1999) 76 Cal.App.4th 1181, 1186) or the issue is of continuing public interest.  (*Patterson v. Board of Supervisors* (1988) 202 Cal.App.3d 22,

19

27 [after an election had taken place, the reviewing court applied the exception to mootness doctrine, to review writ ordering the deletion of portions of ballot arguments]; *Brennan v. Board of Supervisors* (1981) 125 Cal.App.3d 87, 90, fn. 2 [reviewing court applied the same exception to review, postelection, a writ requiring revision of digest prepared by Ballot Simplification Committee].)

However, RAIT had multiple opportunities prior to the election to object, so it was within RAIT's power to prevent the matter from becoming moot by objecting to the continuance that was ordered on September 24, 2021.  Instead, after both parties submitted, the trial court recognized the need "to get this heard sooner rather than later" but went on to state there was no emergency requiring that it be heard before the election date. Neither party objected, and the court set the matter for a trial setting/status conference in 10 days, on October 6, 2021. RAIT forfeited any claim of error arising from the continuance ordered on September 24, 2021.

RAIT also forfeited any claim arising from the continuance ordered on October 6, 2021, where the matter was called and both parties indicated they had reached an agreement about how long the hearing would last and whether the parties would stipulate to any facts.  RAIT's counsel indicated his preference for having the hearing take place before the election and that he was willing to submit on the briefing already filed.  The City was concerned about the time required to prepare appendices of disputed documents, as well as the time needed by the court to consider the matter.  The matter was then continued—without objection—to October 22, 2021.

20

The matter came on again for hearing on November 9, 2021, after the election. At that time, after hearing argument, the court issued a preliminary injunction enjoining certification of the election until after the case was decided. The court set another date (this one in January 2022) for a final ruling on the petition for writ of mandate, without objection by RAIT. By failing to object to the continuances, RAIT forfeited any claim of error in failing to decide the matter before the election.

"The forfeiture rule generally applies in all civil and criminal proceedings." (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.) "'"The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had ...."' [Citation.] '"No procedural principle is more familiar to this Court than that a *constitutional* right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."'" (*Keener*, *supra*, at p. 264; see *City of Glendale v. Marcus Cable Associates, LLC* (2014) 231 Cal.App.4th 1359, 1379-1380.)

RAIT not only forfeited the error by agreeing to the continuances, it invited the error. "The 'doctrine of invited error' is an 'application of the estoppel principle': 'Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.)

In the present case, the election had taken place prior to the court's decision on the petition for writ of mandate, and the electors approved the measure. Additionally, the

trial court correctly concluded it lacked authority to enjoin the certification of the election results.  The issue is moot.

## DISPOSITION

The judgment granting declaratory relief on the second cause of action is reversed; the judgment on the remainder of the petition is affirmed.  The City is the prevailing party.  The City is entitled to costs on appeal.

RAMIREZ
                            P. J.

I concur:

McKINSTER
                J.

RAPHAEL, J., concurring.

I agree with Section II of the majority opinion's Discussion section and with the disposition. I respectfully write separately as I analyze the issue in Section I of the Discussion section differently.

We are interpreting a provision of our state constitution when we determine whether the vote on Measure C was consolidated with a regularly scheduled general election. The constitutional provision uses the word "election" twice: "The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government." (Cal. Const., art. XIII C., § 2, subd. (b).) The first use refers to the tax vote required by that constitutional subdivision. The subdivision requires that a local government cannot impose a general tax until the "tax is submitted to the electorate and approved by a majority vote." (*Ibid*.) That is the Measure C vote. The second use of "election" refers to the election that the tax vote must be consolidated with. That means the tax vote must be held when certain regularly scheduled elections are set.

The dispute here is not about the characteristics of the Measure C vote, as it is undisputed that it involves a general tax governed by the constitutional provision. Rather, the dispute is about the election that Measure C is consolidated with.

The constitutional provision requires the tax election be consolidated with—that is, held concurrently with—"a regularly scheduled general election" for the city council.

1

(Cal. Const., art. XIII C., § 2.)  That includes a runoff date where no members of the city council end up on the ballot, as *Silicon Valley Taxpayers Association v. Garner* (2013) 216 Cal.App.4th 402, 407-408 decided over a decade ago in a case involving a runoff election for county supervisors.  The vote on Measure C was held on such a date, so the tax was legally enacted.

This is what our *constitution* requires in Article XIII C.  That requirement does not depend on what label the city council gives to an election.  The appellant's main argument turns on the fact that in Section 501 of its charter, the City of Riverside defined all elections other than those on the statewide June primary date as "special municipal elections."  Even if city council members were on the November ballot with Measure C, the election would still be labeled as a "special" one by Section 501.

Whether a city labels an election day a "general election" or a "special election" should not matter to the construction of the state constitution.  If it mattered, the meaning of the constitution would then turn on the labels that California's 483 cities (or at least the over 100 charter cities) affix to their voting.  Under the appellant's analysis, the vote would be constitutional if a city had the same situation as the City of Riverside had here, yet its charter declared the November 2, 2021, election a "general election."  Whether the November 2, 2021, election qualifies under the constitutional provision turns on the constitutional test ("regularly scheduled general election" for local officials), not on what each city calls it.  Even though a California city's charter can supplant some state laws,

2

state constitutional provisions are supreme. (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170.)

How the city characterized the vote on *the measure* also should not matter. What matters is the November 2 election the measure was "consolidated with."

Every measure placed on a ballot by a city is a "special election" in the sense that it is a one-time event that must be scheduled. (See Elec. Code § 356 [special election occurs when the time for holding it is not set by law].) When the City of Riverside referred to the Measure C election as a "special municipal election," it was not referring to the November 2 ballot in general, locally or statewide. It was stating that it was scheduling the one-time vote on the Measure C election.

That is, the city council's resolution setting the election gave notice of a "special municipal election" for a vote on Measure C. It repeatedly called that election a "special election." Yet in the same resolution it recognized the constitutional requirement of Article XIII C, section 2 and cited *Silicon Valley*, *supra*, 216 Cal.App.4th 402, as controlling its conclusion that the November 2 election would be a "regularly scheduled general election" under that provision. It directed the Measure C election consolidated with all other elections held on November 2 "as if there were only one election" with "only one form of ballot." The resolution thereby set a special election on Measure C, but requested that the County of Riverside "consolidate" the city's election with the county's uniform election that was to be held "concurrent with" the Measure C election on November 2. That was the city council runoff date. The council's decision thereby

3

tracked the constitutional language and followed *Silicon Valley* by setting the one-time vote on Measure C for a "regularly scheduled general election" that was the city council runoff date.

Had the city held the special election on Measure C on any other date in the second half of 2021, it would still be a vote on the tax. But it would not be a constitutional way to enact it because it would not have been consolidated with a regularly scheduled general election that could include council members.

The majority opinion adds a requirement, not derived from the constitutional text, that the tax vote be consolidated not just with a regularly scheduled local government election, but one occurring on the date of a "statewide general election." (Maj. opn., *ante*, at p. 16; see *id*. at p. 19.) It does not appear that a statewide general election occurred on November 2, 2021. (See Elec. Code §§ 324, 1000, 1001.) I reach the same result as the majority because there is no such requirement.

The majority also suggests that its result comes from disregarding a "literal" interpretation of local statutes that leads to "absurd consequences" that contravene the purpose of the state statutes. (Maj. opn., *ante*, at pp. 12-13.) The majority does so because it believes local statutes are in "conflict" with state ones. (Maj. opn., *ante*, at p. 15.) In contrast, I conclude we do not need to disregard local statutes, and they do not conflict with the constitution. How the city characterizes the Measure C vote simply does not bear on whether the November 2 election qualifies under the constitutional test.

RAPHAEL

J.

4

Filed 8/19/24

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| RIVERSIDERS AGAINST INCREASED TAXES,<br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF RIVERSIDE et al.,<br>        Defendants and Appellants;<br><br>REBECCA SPENCER,<br>        Defendant and Respondent. | E078961<br><br>(Super.Ct.No. CVRI2104120)<br><br>ORDER CERTIFYING<br>OPINION FOR PUBLICATION |

THE COURT:

Requests having been made to this court pursuant to California Rules of Court, rule 8.1120(a), for publication of a nonpublished opinion heretofore filed in the above matter on July 25, 2024, and it appearing that the opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c),

IT IS ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(b). The opinion filed in this matter on July 25, 2024, is certified for publication.

CERTIFIED FOR PUBLICATION

RAMIREZ
                                                                P. J.

We concur:

McKINSTER
                        J.

RAPHAEL
                        J.